### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **MS. M., individually and as parent and legal guardian of O.M., a minor,** | ) ) ) | |
| **Plaintiff** | ) ) | |
| **v.** | ) ) | **No. 2:15-cv-16-DBH** |
| **FALMOUTH SCHOOL DEPARTMENT,** | ) ) | |
| **Defendant** | ) | |

### RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Ms. M., parent of student O.M., challenges rulings by a Maine Department of Education ("MDOE") hearing officer pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and its state-law analogue, 20-A M.R.S.A. § 7001 *et seq.*, that, although the defendant Falmouth School Department ("Falmouth") committed the procedural violation of failing to provide literacy instruction in the form of the so-called "SPIRE" program during the 2013-14 school year, it provided O.M. with a free appropriate public education ("FAPE"), and, by virtue of a settlement agreement, Ms. M. waived claims under the IDEA for the period between September 1, 2013, and December 17, 2013. *See* Plaintiff's Memorandum of Law ("Parent's Brief") (ECF No. 18) at 17-29.

Falmouth contests that it committed a procedural violation but argues that, in any event, the hearing officer correctly concluded that, despite disagreements between itself and Ms. M. on literacy instruction methodologies, it provided O.M. with a FAPE during the 2013-14 school year, thus barring relief. *See* Defendant Falmouth School Department's Memorandum of Law

("School's Brief") (ECF No. 23) at 8-31.   It contends that, to the extent that the court concludes

that Ms. M. is entitled to any remedy, the hearing officer correctly found that she waived any claim

for the period from September 1, 2013, through December 17, 2013.  *See id*. at 31-34.

After careful review of the administrative record, as well as additional evidence submitted

by affidavit and deposition with the court's permission, *see* Memorandum Decision and Order on

Motion To Supplement the Record (ECF No. 14) at 10-11; Declaration of Ms. M. ("Ms. M. Decl.")

(ECF No. 17); Deposition of Kathleen Coffin ("Coffin Dep.") (ECF No. 19-1), I recommend that

the court adopt the following findings of fact and conclusions of law and deny the plaintiff's

request for relief.

## I.  Applicable Legal Standards

### A.  IDEA

1.      The IDEA is a "comprehensive statutory scheme" that Congress enacted to ensure

that all children with disabilities are accorded a FAPE and that both their rights and those of their

parents are protected.  20 U.S.C. § 1400(d)(1)(A)-(B); *Frazier v. Fairhaven Sch. Comm.,* 276 F.3d

52, 58 (1st Cir. 2002).

2.      As a condition for receiving federal funds, states are required to provide a FAPE to

all disabled children.  *See, e.g., Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.,* 518 F.3d 18,

23 (1st Cir. 2008).   In order to provide a FAPE, a school must create and then follow an

"individualized education program" ("IEP") for each disabled child.  *D.B. ex rel. Elizabeth B. v.

Esposito,* 675 F.3d 26, 34 (1st Cir. 2012).  The IEP is "a written statement for each child with a

disability that is developed, reviewed, and revised" in accordance with the IDEA and must include,

among other things, the following: a statement of the child's present levels of academic

achievement and functional performance; a statement of measurable annual goals; criteria for

measuring progress toward those goals; and a statement of the specific services that the school will offer.  20 U.S.C. § 1414(d)(1)(A).

3.     The IDEA imposes additional procedural and substantive requirements with regard to the IEP.  *See, e.g., Roland M. v. Concord Sch. Comm.,* 910 F.2d 983, 987-88 (1st Cir. 1990). For example, parents have the right to be part of the IEP "team" along with the teachers and other educational professionals charged with formulating a child's particular IEP.  20 U.S.C. § 1414(d)(1)(B); *Lessard,* 518 F.3d at 23.  The purpose behind such procedural safeguards is to "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate."  *Pihl v. Massachusetts Dep't of Educ.,* 9 F.3d 184, 187 (1st Cir. 1993) (citation and internal quotation marks omitted).  Thus, in the event of a dispute between the school and the child's parents regarding the IEP, the parents have the right to demand a hearing by an impartial hearing officer. *See, e.g*., 20 U.S.C. § 1415(f)(1)(A), (B)(ii).  A party dissatisfied with a hearing officer's decision may seek judicial review of that decision by a state court or a federal district court, which must (i) receive the records of the administrative proceedings; (ii) hear additional evidence at the request of a party; and (iii) grant relief as it deems appropriate based upon the preponderance of the evidence.  *See, e.g., id.* § 1415(i)(2)(A), (C).

4.     A court's authority to grant relief under the IDEA "includes the power to order school authorities to reimburse parents for their expenditures on private school education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act."  *Pihl,* 9 F.3d at 188 (citation and internal quotation marks omitted).

### B.  Standard and Scope of Review

5.     The role of the district court is to render bounded, independent decisions – bounded by the administrative record and additional evidence, and independent by virtue of being based on

a preponderance of the evidence before the court." *Hampton Sch. Dist. v. Dobrowolski*, 976 F.2d 48, 52 (1st Cir. 1992) (citation and internal quotation marks omitted). "While the court must recognize the expertise of an administrative agency, as well as that of school officials, and consider carefully administrative findings, the precise degree of deference due such findings is ultimately left to the discretion of the trial court." *Id*. (citations and internal quotation marks omitted).

6.     The First Circuit and other courts have suggested that with respect to a hearing officer's legal conclusions, the level of deference due depends on whether the court is equally well-suited to make the determination despite its lack of educational expertise. *See, e.g., Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004) ("Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation. More weight, however, is due to an agency's determinations on matters for which educational expertise is relevant.") (citations and internal quotation marks omitted); *Abrahamson v. Hershman*, 701 F.2d 223, 231 (1st Cir. 1983) (noting that while it might be "inappropriate for a district court under the rubric of statutory construction to impose a particular educational methodology upon a state[,]" court was free to construe term "educational" in IDEA "so as to insure, at least, that the state IEP provides the hope of educational benefit."). Even as to findings of fact, the court retains the discretion, after careful consideration, "to accept or reject the findings in part or in whole." *Town of Burlington v. Department of Educ.*, 736 F.2d 773, 792 (1st Cir. 1984), *aff'd* 471 U.S. 359 (1985).

7.     In IDEA cases, as in other contexts, the burden of persuasion rests on the party seeking relief. *See, e.g., Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005); *Dobrowolski*, 976 F.2d at 54; *Maine Sch. Admin. Dist. No. 35 v. Mr. & Mrs. R.,* 176 F. Supp.2d 15, 23 (D. Me. 2001) (rec.dec., *aff'd* Feb, 27, 2002), *rev'd on other grounds*, 321 F.3d 9 (1st Cir. 2003) ("The

party allegedly aggrieved must carry the burden of proving . . . that the hearing officer's award was contrary to law or without factual support.").

## C. Adequacy and Appropriateness of IEP

8.      A parent may challenge a hearing officer's IDEA decision on either or both of two bases: that a particular school district did not comply with the procedures set forth in the act and/or that the IEP developed through the act's procedures was not reasonably calculated to enable a child to receive meaningful educational benefits.  *Board of Educ. v. Rowley,* 458 U.S. 176, 206-07 (1982).  Ms. M. has raised both types of challenges.

9.      In *Burlington*, the First Circuit identified certain "basic guidelines" for determining the adequacy of an IEP, among these being the "achievement of effective results" and "demonstrable improvement in the educational and personal skills identified as special needs[.]" *Burlington*, 736 F.2d at 788.  The First Circuit subsequently clarified in *Roland M.* that, while "actual education results are relevant to determining the efficacy of educators' policy choices[,]" parties nevertheless should not "confuse what is *relevant* with what is *dispositive.*" *Roland M.*, 910 F.2d at 991 (emphasis in original). Although "[a]ctual educational progress can (and sometimes will) demonstrate that an IEP provides a FAPE . . . impos[ing] the inverse of this rule – that a lack of progress necessarily betokens an IEP's inadequacy – would contradict the fundamental concept that an IEP is a snapshot, not a retrospective."  *Lessard,* 518 F.3d at 29 (citation and internal punctuation omitted).  "[T]he issue is not whether the IEP was prescient enough to achieve perfect academic results, but whether it was 'reasonably calculated' to provide an 'appropriate' education as defined in federal and state law."  *Roland M.*, 910 F.2d at 992.

10.      In addition to developing an IEP that is reasonably calculated to provide meaningful educational benefits, *D.B.,* 675 F.3d at 34-35, a school district is required to implement the IEP in accordance with its requirements, *see, e.g., Doe ex rel. Doe v. Hampden-Wilbraham Reg'l Sch.*

*Dist.,* 715 F. Supp.2d 185, 195 (D. Mass. 2010) (*citing* 20 U.S.C. § 1401(9)(D)). Although perfect implementation is not required, courts have found that "the failure to implement a material or significant portion of the IEP can amount to a denial of FAPE." *Sumter Cty. Sch. Dist. 17 v. Heffernan ex rel. TH,* 642 F.3d 478, 484 (4th Cir. 2011). *See also, e.g., Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J,* 502 F.3d 811, 822 (9th Cir. 2007) ("a *material* failure to implement an IEP violates the IDEA") (emphasis in original).

## II.  Proposed Findings of Fact

1.      Ms. M., a resident of Falmouth, Maine, is the parent and legal guardian of O.M., a 10-year-old student with a disability.  Complaint (ECF No. 1) ¶ 4; Answer (ECF No. 8) ¶ 4.  Ms. M. is a certified special education teacher with experience instructing students with disabilities in both Florida and Maine.  Order ("Hearing Decision"), [*Ms. M.*] *v. Falmouth School Department*, No. 14.054H (Me. Dep't of Educ. Oct. 14, 2014), at 3, ¶ 2[1]; Testimony of Ms. M. ("*Ms. M.*"), Record, Vol. XIII at 2734-35.

2.      O.M., who has Down syndrome as well as Attention Deficit Hyperactivity Disorder ("ADHD"), was in fourth grade at Falmouth Elementary School as of January 2015.  Complaint ¶ 8; Answer ¶ 8; Record, Vol. VI at 1223.

3.      O.M. is eligible for special education and related services under the category of multiple disabilities, specifically, an intellectual disability and other health impairments.  Hearing Decision at 4, ¶ 3; Record, Vol. IV at 897.

---

[1] For ease of reference, I refer to the consecutively numbered pages of the Hearing Decision rather than the Record pages where it is found, Administrative Record ("Record"), Vol. XII at 2635-76.  I have drawn my proposed facts from the hearing officer's findings, corrected in some minor respects and supplemented by additional Record information, portions of the complaint and answer cited by the parties, the declaration of Ms. M., and the Coffin deposition.

4.      O.M. had early delays in oral communication skills and began receiving speech-language therapy through Child Development Services when she was six months old.   Hearing Decision at 4, ¶ 4; Complaint ¶ 9; Answer ¶ 9.   She communicated only through American Sign Language through age four.   *Id.*; *Ms. M.*, Record, Vol. XIII at 2736.

5.      Since her kindergarten year, 2010-11, O.M. has attended Falmouth public schools and received various services pursuant to IEPs, including specialized direct instruction and speech-language services.   Hearing Decision at 4-9, ¶¶ 5-23; Complaint ¶¶ 10-13, 21-23; Answer ¶¶ 10-13, 21-23.

6.      O.M.'s first-grade general education teacher, who holds a master's degree in literacy, included her in the classroom's reading groups.   Complaint ¶ 11; Answer ¶ 11.   In first grade, O.M. mastered all of her kindergarten literacy goals.   *Id.*; Record, Vol. I at 162.

7.      O.M. began second grade in September 2012.   Hearing Decision at 5, ¶ 9; Complaint ¶ 13; Answer ¶ 13.   As of November 5, 2012, when O.M.'s annual 2012-13 IEP was sent to Ms. M., O.M. was reported to be reading at level 8 on the Developmental Reading Assessment ("DRA") scale.   Hearing Decision at 5, ¶ 10; Record, Vol. I at 202, 205.   DRA levels 8 through 16 correlate with a first-grade reading level.   Hearing Decision at 8, ¶ 19; Testimony of Gene Kucinkas, Jr. ("*Kucinkas*"), Record, Vol. XIII at 2817.   For DRA assessment purposes, a distinction is made between being able to read with no support or minimal support (that is, at an "independent level") and being able to read with support (that is, at an "instructional level").   Hearing Decision at 8, ¶ 19; Testimony of Kimberly Mosca ("*Mosca*"), Record, Vol. XIV at 2896-97.   The team set three annual reading goals: mastering "final-e" endings, mastering consonant blends with 90 percent accuracy, and attaining DRA level 16 with 80 percent accuracy by November 2013.   Hearing Decision at 5, ¶ 10; Record, Vol. I at 207.

7

8.      In late November 2012, Ms. M. emailed O.M.'s teachers to express her concern with O.M.'s reading instruction.  Hearing Decision at 6, ¶ 11; Record, Vol. I at 226.  The program then in use, she wrote, "relies on memory skills, and repetitively utilizes the same text."  Record, Vol. I at 226.  She added that the program "does not explicitly teach reading skills, such as V-C-E, or –ang words, etc." *Id*.  She stated, "With the knowledge that we have of [O.M.], we know that she needs to be directly taught skills, and repeatedly given the chance to practice them, such as an Orton-Gillingham approach: phonetic, systematic, sequential." *Id*.

9.      The IEP team met on February 26, 2013, and determined that O.M.'s specially designed reading instruction would increase to a total of one hour daily.  Hearing Decision at 6, ¶ 11; Record, Vol. IX at 2054.

10.      During March and April 2013, as part of a triennial evaluation of O.M., her special education teacher, Rachel Roberts, administered academic assessments.  Hearing Decision at 6, ¶ 14; Record, Vol. IV at 715.  O.M.'s scores on the Phonological Awareness Test were below average, although she was "developing in her phonological awareness skills."  Hearing Decision at 6, ¶ 14; Record, Vol. IV at 717.  Her scores indicated a "lack of development and secure sound/symbol knowledge," which "affect[ed] her ability to decode words effectively."  Record, Vol. IV at 717.  Her overall score on the Test of Early Written Language-Third Edition was 81, below average, and her composite score on the Test of Early Reading Ability-Third Edition was 72, in the third percentile.  Hearing Decision at 6, ¶ 14; Record, Vol. IV at 718-19.  Roberts concluded that these scores were not surprising, given that O.M. required much support, repetition, supplemental aids, variety in delivery of services, and prompts.  Hearing Decision at 6-7, ¶ 14; Record, Vol. I at 720.  Ms. M. was surprised and troubled by these results. *Ms. M*., Record, Vol. XIII at 2741-42.

8

11.     The IEP team met on May 14, 2013, following O.M.'s triennial evaluations. Hearing Decision at 7, ¶ 16; Record, Vol. IV at 736.  Falmouth reported that O.M. was reading at DRA level 10, and the IEP team determined, among other things, that O.M. would receive extended school year ("ESY") services.  Record, Vol. IV at 736.  However, concerned that O.M. had progressed only from a DRA level 8 to a DRA level 10, Ms. M. enrolled her in the Bates College Summer Reading Program during the summer of 2013 rather than using Falmouth's ESY services.  Hearing Decision at 7, ¶ 17; *Ms. M*., Record, Vol. XIII at 2742-43.

12.     The Bates College Summer Reading Program took place over a period of six weeks and featured phonemic work and decoding.  Record, Vol. III at 674-75; *Ms. M*., *id*., Vol. XIII at 2743.  During that summer, O.M. also practiced reading at night.  *Ms. M*., *id*. at 2743.

13.     O.M. began third grade at the Falmouth Elementary School in September 2013. Hearing Decision at 7, ¶ 18; Record, Vol. IV at 897.  She had two regular education teachers, Jeanne Coppinger and Suzy Palmer, a speech and language pathologist, Beth Weller, a special education teacher who also served as her case manager and literacy instructor, Kim Mosca, and a math instructor, Megan Huckins.  Hearing Decision at 7-8, ¶ 18; *Kucinkas*, Record, Vol. XIII at 2816; *Mosca*, Record, Vol. XIV at 2898.  She began the school year with the IEP developed on October 18, 2012, as amended on February 26, 2013, to increase the level of specially designed instruction.  Record, Vol. I at 202-24, Vol. IX at 2054-57.

14.     At the start of third grade, Falmouth measured O.M.'s reading level at only a DRA level 6 or 7.  *Ms. M*., *id*., Vol. XIII at 2744.  On September 16, 2013, Ms. M. requested an IEP team meeting and submitted a list of parental concerns to be addressed.  Complaint ¶ 22; Answer ¶ 22.

15.     An IEP meeting was held on October 3, 2013, to discuss parental concerns. Hearing Decision at 8, ¶ 20; Record, Vol. IV at 804.  Falmouth also proposed a structured reading program for O.M.  Hearing Decision at 8, ¶ 20; Record, Vol. IV at 807.

16.     In an email dated October 10, 2013, Ms. M. reiterated her dissatisfaction with O.M.'s literacy instruction.  Record, Vol. IV at 823.  She requested a reading program that "consists of decoding, comprehension, vocabulary, fluency, and sight words[,]" administered by an instructor trained in the Wilson or Orton-Gillingham program.  *Id.*

17.     On October 15, 2013, Ms. M. sent an email to the school stating:

> I am interested in learning what are the scientifically research based education programs used to educate [O.M.] in reading, math, and language arts.  What training do her instructors have in these programs, and how is progress measured?

*Id.* at 832.  She received no response.  *Ms. M.*, *id.*, Vol. XIII at 2747.

18.     In an October 28, 2013, email listing issues that Ms. M. wanted addressed at an IEP team meeting scheduled for October 31, 2013, she requested that Falmouth retain Dr. Christopher Kaufman to conduct a cognitive, academic, and literacy evaluation of O.M.  Record, Vol. IV at 846-47.

19.     An IEP team meeting was held on October 31, 2013, during which O.M.'s DRA levels were reported to be 8 with minimal support and 10 with support.  Hearing Decision at 8, ¶ 21; Record, Vol. IV at 897, 900.  During the meeting, Falmouth agreed to provide O.M. with a literacy program known as SPIRE.  *Ms. M.*, Record, Vol. XIII at 2785-86.  However, O.M.'s IEP itself did not provide for instruction in SPIRE, merely stating that she would receive eight hours and 45 minutes per week of specially designed instruction in literacy and math.  Hearing Decision at 8-9, ¶ 22; Record, Vol. IV at 934; *Ms. M.*, *id.*, Vol. XIII at 2786.  O.M.'s literacy goal was set

at DRA level 16, the same reading goal she had in her prior IEP.  Hearing Decision at 9, ¶ 23; Record, Vol. IV at 932.[2]

20.    In a written notice dated October 31, 2013, sent to Ms. M. on November 5, 2013, Falmouth proposed that O.M. receive 60 minutes daily of reading instruction in SPIRE.  Hearing Decision at 9, ¶ 24; Record, Vol. IV at 862-63 (stating, "Provide 60 minutes per day reading instruction Spire in an alternative setting close to the reg[ular] classroom.").

21.    SPIRE is one of several Orton-Gillingham-based teaching methodologies that provide a "heavily teacher directed, systematic, multisensory, synthetic phonics instructional program of the type developed decades ago by Orton-Gillingham[.]"  Hearing Decision at 9, ¶ 25; Testimony of Christopher Kaufman, Ph.D. ("*Kaufman*"), Record, Vol. XIII at 2693.  These programs are "highly sequential, they're highly systematic, [and] their scope and sequence tends to be very favorable to students with substantial learning challenges[.]"  *Kaufman*, Record, Vol. XIII at 2693.

22.    Weller, O.M.'s speech and language pathologist, testified that Falmouth was "looking for . . . a comprehensive reading program [for O.M.] that had all of the components of a good reading program, and a program that went through and would be a systematic approach, and I think that SPIRE offers that."  Testimony of Beth Weller ("*Weller*"), Record, Vol. XIV at 2936. She testified that SPIRE has "a phonological awareness component" and "a step that covers

---

[2] O.M.'s 2013-14 IEP provided for a number of other supports and services, including two hours per week of speech/language services, half an hour of which would be provided in a regular classroom, one hour per week of physical therapy, two hours per week of occupational therapy, half an hour of which would be provided in the regular classroom, various aids, including a slant board, seat cushions, movement breaks, and visual supports, 30 minutes per week of social skills support, and a behavior plan.  Hearing Decision at 8-9, ¶ 22; Record, Vol. IV at 934-36.  Falmouth points out that, because O.M.'s annual IEP was generally prepared in late October or early November each school year, spanning the period from November to November, she had two different annual IEPs during the 2013-14 school year.  *See* School's Brief at 6; Record, Vol. I at 202, Vol. IV at 897.  As noted below, the annual IEP prepared in October 2013 was also amended in May 2014.  The parties' dispute centers on the annual 2013-14 IEP prepared in late October 2013.

concepts and vocabulary and background knowledge[,]" and that the program "works on comprehension, . . . contextual reading, . . . encoding or spelling . . . with some phonemic activities to go along with that[,]" and fluency. *Id*. Mosca was not trained in SPIRE at the time of the written notice and did not receive SPIRE training until August 2014. Hearing Decision at 9, ¶ 25; *Mosca*, Record, Vol. XIV at 2896.

23.     O.M.'s IEP progress report dated November 3, 2013, rated her progress on two of her three reading goals as satisfactory – "[m]oving along at expected rate" – and her progress on the third goal, the ability to read and comprehend books at a DRA level 16 with 80 percent accuracy, as limited – "[s]ome progress but less than expected[.]" Record, Vol. V at 982.

24.     Ms. M. filed a due process hearing request on November 5, 2013, which was amended on December 2, 2013. Hearing Decision at 9, ¶ 26; Record, Vol. V at 955-64, 1027. She alleged, *inter alia*, that Falmouth had failed to provide effective instruction to O.M. from 2011 to the present due to non-evidence-based instructional programs, as demonstrated by a lack of progress. *Id*.

25.     By letter dated November 14, 2013, Ms. M. informed Gene Kucinkas and Polly Crowell, Falmouth's co-directors of special education, that she was "NOT in agreement" with the proposal to use the SPIRE reading program for O.M. Hearing Decision at 10, ¶ 27; Record, Vol. V at 969, 977. In particular, she was concerned that SPIRE was not evidence-based because there was no objective research proving that it could help O.M. *Id*.

26.     Based on that communication, Falmouth did not proceed with using SPIRE but, instead, continued the multifaceted reading program that Mosca had been using. *Kucinkas*, Record, Vol. XIII at 2825-26.

27.     Mosca testified that, while she did not use the SPIRE program with O.M., she provided daily literacy instruction using DRA level-system books, the Wilson FUNdations fluency program, and Lexia, a computer-based phonics program.  Hearing Decision at 11, ¶ 33; *Mosca*, Record, Vol. XIV at 2911-14.  She kept records of O.M.'s reading on daily instruction sheets that she sent home to Ms. M. each day.  Hearing Decision at 11-12, ¶ 34; *Mosca*, Record, Vol. XIV at 2899-900.  These instruction sheets documented a structured literacy instruction format involving prediction activities, decoding words, grammar, and a "picture walk" to orient O.M. to the text. *Id*.  After O.M. read the text, Mosca highlighted errors with her.  Hearing Decision at 12, ¶ 34; *Mosca*, Record, Vol. XIV at 2912.

28.     O.M. used the Lexia reading program to work on segmenting, consonants, vowels, and medial word skills.  Hearing Decision at 12, ¶ 35; *Mosca*, Record, Vol. XIV at 2913.  She was not able to use Lexia independently because of her distractibility.  *Id*.  Mosca did not ask O.M. to work independently on Lexia; she worked one-on-one with her on it.  *Mosca*, Record, Vol. XIV at 2913.

29.     Weller also worked with O.M. during three weekly 30-minute sessions.  Hearing Decision at 12, ¶ 36; *Weller*, Record, Vol. XIV at 2930.  Weller's sessions with O.M. included tasks that touched on reading ability, including understanding words with multiple definitions, word endings, and expression of concepts.  Hearing Decision at 12, ¶ 36; *Weller*, Record, Vol. XIV at 2932.  Weller also met weekly with other staff in order to coordinate and reinforce O.M.'s literacy skills and training.  Hearing Decision at 12, ¶ 36; *Weller*, Record, Vol. XIV at 2931.  She testified that communication between team members was excellent.  *Id*.  Weller testified that, during 2013-14, O.M. made "reasonable progress given her cognitive profile" on the goals with which Weller was assisting her.  Hearing Decision at 13, ¶ 37; *Weller*, Record, Vol. XIV at 2936.

30.     Although Ms. M. expressed her disagreement with the use of SPIRE, she mistakenly assumed that Falmouth was using the program and so indicated to Dr. Kaufman during an interview in January 2014.  Record, Vol. VI at 1208; *Kaufman*, *id*., Vol. XIII at 2687; *Ms. M*., *id.* at 2787.

31.     Kucinkas and Ms. M. met on December 13, 2013, and reached an agreement that was documented in a letter of the same date.  Hearing Decision at 10, ¶ 28; Record, Vol. V at 1042-43.  Falmouth agreed to (i) the use of a daily communication sheet, (ii) a weekly email from the case manager, (iii) a monthly meeting among Ms. M., Kucinkas, and Mosca, (iv) an evaluation of O.M. by Dr. Kaufman, following which "the IEP team will meet to consider Dr. Kaufman[]'s evaluation and recommendations and will adjust the IEP in light of those recommendations[,]" (v) an assistive technology evaluation, (vi) a consultation by Dr. Gretchen Jefferson regarding O.M.'s program, (vii) the reading of determinations at the conclusion of IEP team meetings, and (viii) the provision of written notice seven days prior to implementation.  *Id*.  Kucinkas noted, "Based upon this agreement, you [Ms. M.] have said that you would withdraw your current due process hearing."  *Id*.

32.     On December 17, 2013, Ms. M. signed a hearing withdrawal request form.  Hearing Decision at 10, ¶ 29; Record, Vol. V at 1059.  The form laid out three options: to withdraw the hearing request (i) without prejudice (defined as "[n]o hearing issues were settled with a written Resolution or Mediation Agreement"), (ii) with prejudice (defined as "[a]ll hearing issues were settled in a written Resolution or Mediation Agreement"), or (iii) both with and without prejudice (defined as "[s]ome hearing issues were settled by a written Resolution or Mediation Agreement; some hearing issues were not settled"; noting, "The outstanding hearing issues will be part of the hearing.").  Record, Vol. V at 1059.  The form contained a checkbox next to the first option but

14

not the second and third.  *Id.*  Ms. M. drew and filled in a box next to the second option, indicating that she wished to withdraw her hearing request with prejudice.  Hearing Decision at 10, ¶ 29; Record, Vol. V at 1059.

33.    Ms. M. testified that she chose this option on the form because it gave her what she needed, and she did not want to face a hearing in January because she was too busy and stressed with the holidays.  Hearing Decision at 11, ¶ 30; *Ms. M.*, Vol. XIII at 2807-08.  She testified that it was not her intent to release her past claims against Falmouth but, rather, to review Dr. Kaufman's report before determining which claims to bring.  Hearing Decision at 11, ¶ 30; *Ms. M.*, Record, Vol. XIII at 2789-90, 2807.  She testified that she created and checked a box suggesting that she was withdrawing her request with prejudice because that option appeared to be the only one that actually terminated the hearing.  *Ms. M.*, Record, Vol. XIII at 2808.  When she signed the hearing withdrawal form she did not disclose to Falmouth that she was reserving the right to file for claims prior to the date she signed the form.  Hearing Decision at 11, ¶ 30; *Ms. M.*, Record, Vol. XIII at 2808 (Ms. M. did not inform Kucinkas that she was going to re-file a hearing request in the spring "because he wouldn't like that.").

34.    While Ms. M. was not represented by counsel at the time she signed the form, she had recently worked with an advocate who had provided advice on other matters.  Hearing Decision at 11, ¶ 31; *Ms. M.*, Record, Vol. XIII at 2807.

35.    Dr. Jefferson, a behavioral evaluator, was retained by Falmouth in January 2014 to conduct a program evaluation to "inform planning for increasing [O.M.'s] engagement and productivity during general education activities and to aid in determining whether her time in the general education classroom can be increased[.]"  Hearing Decision at 13, ¶ 40; Record, Vol. VI at 1191.  As part of her evaluation, Dr. Jefferson interviewed school staff and Ms. M. and observed

O.M. working on her specially designed literacy program with Mosca on January 16 and 17, 2014. Hearing Decision at 14, ¶ 41; Record, Vol. VI at 1191; Testimony of Gretchen Jefferson, Ph.D. ("*Jefferson*"), Record, Vol. XIV at 2874.  Dr. Jefferson testified that O.M. seemed to know what was expected, was oriented to the instruction and demonstrated accuracy of 80 percent, with no apparent loss of instructional time or engagement during the 70-minute session.  Hearing Decision at 14, ¶ 41; *Jefferson*, Record, Vol. XIV at 2874-75.

36.     Dr. Jefferson stated that, based on her observations, Falmouth's program was "excellent" and the "team was making it work[.]"  Hearing Decision at 14, ¶ 42; *Jefferson*, Record, Vol. XIV at 2877-78.

37.     Mosca wrote an email to Ms. M. on January 10, 2014, noting that O.M. was reading at a DRA level 13.  Hearing Decision at 13, ¶ 39; Record, Vol. V at 1064.

38.     In an email to Ms. M. dated February 14, 2014, Mosca stated that O.M. was "doing great" with reading consonants and had begun reading DRA level 14 books.  Hearing Decision at 17, ¶ 56; Record, Vol. V at 1101.  That DRA level was an instructional, not an independent, one. *Mosca*, Record, Vol. XIV at 2917.  In an email to Mosca of the same date, Ms. M. wrote that she was "glad that [O.M. was] making limited progress," although she continued to advocate for her to have "an instructional method that fits her needs[.]"  Hearing Decision at 18, ¶ 58; Record, Vol. V at 1102.

39.     In an email to Ms. M. dated March 12, 2014, Mosca reported that O.M. was reading at a DRA level 14.  Hearing Decision at 17, ¶ 57; Record, Vol. V at 1145.  In an email to Ms. M. dated March 21, 2014, Mosca noted that O.M. had dabbled in DRA level 16 but that reading at that level was "a stretch" for independent reading.  Hearing Decision at 17, ¶ 57; Record, Vol. VI

at 1244.  At that time, a "cold read" (no pre-teaching of the book to O.M. before reading) remained difficult for her at a level 14.  *Id*.

40.     In January 2014, Falmouth retained Dr. Kaufman to evaluate O.M.'s neurodevelopment, including memory, language, visual-spatial, and sensory/motor functioning. Hearing Decision at 14-15, ¶ 45; *Kaufman*, Record, Vol. XIII at 2687.  He understood that the parties had agreed to use him as an evaluator of O.M.  Hearing Decision at 15, ¶ 45; *Kaufman*, Record, Vol. XIII at 2686.

41.     Dr. Kaufman evaluated O.M.'s academic functioning using the Wechsler Individual Achievement Test, the Wilson Assessment of Decoding and Encoding, the Gray Diagnostic Reading Test, the Gray Oral Reading Test, and the Adaptive Behavior Assessment System.  Hearing Decision at 15, ¶ 46; Record, Vol. VI at 1211.  He found that O.M. had substantially limited oral reading skills compared with peers of her age and grade, with scores consistent with an early first grade functional level.  Hearing Decision at 15, ¶ 48; Record, Vol. VI at 1236-37; *Kaufman*, *id*., Vol. XIII at 2691.  He noted that O.M. had pervasive challenges in the broader developmental domain and "fairly substantial challenges across intellectual, processing, academic, and self-regulatory domains" that would impact her development of a range of adaptive functions, as well.  Hearing Decision at 15, ¶ 48; *Kaufman*, Record, Vol. XIII at 2688.

42.     O.M. had a full-scale IQ of 58, a verbal IQ of 63, and a nonverbal IQ of 57, each of which is at or below the first percentile and is indicative of a mild intellectual disability.  Record, Vol. VI at 1217.  Her working memory score was below the first percentile, a "profound" working memory deficit.  *Id*. at 1233; *Kaufman*, *id*., Vol. XIII at 2702.

43.     Dr. Kaufman noted that O.M. was "a very complicated learner" but had relative strengths in acquiring knowledge (long-term memory) and verbal fluid reasoning.  *Kaufman*,

Record, Vol. XIII at 2689-90, 2698.  He indicated that these characteristics "auger[ed] well" for her and that, "[e]ven though [O.M.'s] working memory skills are at least statistically quite challenged, students whose parents really work actively with them and who attend a good school district frankly and have teachers who work with them too, even if they have a very narrowly defined attentional set and working memory set and, therefore, they have to keep on refreshing what's in there to put it into long-term memory, . . . they can still learn and remember stuff pretty well[.]"  *Id*. at 2701.

44.   Dr. Kaufman observed Mosca doing phonetic and word-family work as well as "guided oral reading" with O.M.  Hearing Decision at 15, ¶ 49; *Kaufman*, Record, Vol. XIII at 2705.  While he recommended additional instructional approaches, he did not observe any instruction offered to O.M. that was either inappropriate or significantly inconsistent with the types of reading practice done for students with reading disorders.  Hearing Decision at 15-16, ¶ 49; *Kaufman*, Record, Vol. XIII at 2705.[3]

45.   Dr. Kaufman testified that the Lexia "screen-based" reading program has a strong research base and can be quite effective and powerful.  Hearing Decision at 16, ¶ 52; *Kaufman*, Record, Vol. XIII at 2694.  He noted that the challenge with screen-based programming is that a student has to be able to maintain independent focus.  *Id*.  Accordingly, for a student with O.M.'s profile, someone such as an educational technician or a resource teacher needs to sit next to the student to cue him or her to attend.  Hearing Decision at 16-17, ¶ 52; *Kaufman*, Record, Vol. XIII at 2694.

---

[3] Dr. Kaufman testified, "I saw nothing done by Ms. Mosca with [O.M.] that I would say would be either inappropriate or significantly inconsistent with the types of reading practice that's done for students who have reading disorders, regardless of the nature of their disability condition.  I would not say it was by any means all of what a literacy specialist would recommend be done with someone like [O.M.] but the practices that I saw that day did not impress me as inappropriate.  I have some recommendations for Ms. Mosca in how she might make them more efficient but . . . the practices were in line with what many . . . practitioners would do in trying to develop reading skills."  *Kaufman*, Record, Vol. XIII at 2705.

46.     For O.M., Dr. Kaufman recommended a heavily teacher-directed, systematic, multisensory, synthetic phonics instructional program of the type developed by Orton-Gillingham, "the big four" being (i) the Lindamood Phoneme Sequencing Program ("LiPS"), (ii) the original Orton-Gillingham reading program, (iii) Barbara Wilson's adaptation ("Wilson"), and (iv) SPIRE. Hearing Decision at 16, ¶ 50; *Kaufman*, Record, Vol. XIII at 2693, 2705-06.

47.     Dr. Kaufman testified that Orton-Gillingham-inspired programs are multisensory in that students use their bodies, especially their fingers, arms, and hands, in understanding the sound structure of language.  Hearing Decision at 16, ¶ 51; *Kaufman*, Record, Vol. XIII at 2693. Given O.M.'s significant issues with articulation, he recommended the LiPS program for her because of its strong emphasis on developing the oral motor mouth movement elements of phonemic instruction.  *Id*.  Dr. Kaufman acknowledged that the LiPS program has been criticized for the demands it places on memory given that it requires students to learn a program-specific instructional vocabulary.  *Kaufman*, Record, Vol. XIII at 2698.  However, he noted that, "although it's an add-on a student has to process and remember, [it] is very scaffolded and cued and supported and then ultimately facilitates learning once the student learns the cues[.]"  *Id*.  As a result, he felt that the possible benefits of LiPS for O.M. outweighed the concerns.  *Id*.

48.     While Dr. Kaufman felt that, of the four Orton-Gillingham-inspired programs, "the LiPS program . . . show[ed] the greatest push towards helping students understand phonics by being able to make phonics reliably with the mouth[,]" *Kaufman*, Record, Vol. XIII at 2694, giving it a "slight edge" over the other three programs for O.M., *id*. at 2707, he testified that "[t]he SPIRE program is a strong program in many respects[,]" *id*. at 2706.  He noted that, while SPIRE, unlike LiPS, did not focus much on oral motor construction, SPIRE was "in many other respects

wonderfully systematic, sequential, multisensory and very explicit and concrete and repetitive" and "could potentially benefit [O.M.] quite a bit if it's performed especially by a provider highly skilled in its use." *Id.* He stated that many literacy specialists "would see SPIRE as being a program that [was] reasonably calculated in many respects to benefit a student like [O.M.] such that it[]s use would also be a clinically informed choice to attempt." *Id.* at 2707. He testified that it was possible to transition a student successfully from a LiPS program to other forms of reading instruction. Hearing Decision at 17, ¶ 53; *Kaufman*, Record, Vol. XIII at 2697.

49.     Dr. Kaufman testified that, while some of the four programs had a "better research basis than others, . . . all four [were] solid programs[,]" and there was "a research base to all of that big four." *Kaufman*, Record, Vol. XIII at 2707. He elaborated:

> There's a lot of anecdotal support to these programs, but all four of the programs have I think reasonably strong research bases, either direct, empirical research, which is to say, controlled research versus theoretically-derived research which is basically bits and pieces come from – their construction comes from other people's research on these elements and they are constructed into a whole program. That's more SPIRE, whereas other programs have more of a true empirical research base.

*Id.* While Dr. Kaufman was not aware of any direct empirical studies of SPIRE as a whole, he stated that he felt "reasonably comfortable saying that it has a reasonably good empirical basis because its bits and pieces have been shown to work effectively in [a] remedial reading context." *Id.* at 2712.

50.     Weller testified that she was familiar with both the LiPS and SPIRE literacy programs. Hearing Decision at 13, ¶ 38; *Weller*, Record, Vol. XIV at 2929. She stated that she preferred SPIRE over LiPS, explaining, "LiPS really works on one component of reading, and that would be that phonemic awareness piece, . . . and I think that there are lots of different ways to develop that and SPIRE just happens to have that as a piece of a . . . multilayered program." Hearing Decision at 13, ¶ 38; *Weller*, Record, Vol. XIV at 2936. She added:

> The other important thing about SPIRE for a student like [O.M.] is that she's using real words and the words that are being practiced are connected eventually to story and text, and so it's integrated. . . .  I think for a student like [O.M.] who is going to have great difficulty generalizing a skill learned, that kind of a program where it is all built in together is going to be more effective.

*Id*.  Weller acknowledged that SPIRE did not use the mouth in the same way as LiPS but testified that SPIRE had "several appropriate activities and uses a multisensory approach to teaching phonemic awareness."  *Id*.  She testified that O.M. was ready for SPIRE.  *See id*.

51.     The IEP team met to review Drs. Kaufman's and Jefferson's evaluations on March 28, 2014.  Hearing Decision at 18, ¶ 59; Record, Vol. VI at 1248-50.  More meeting time was needed, and a follow-up meeting was scheduled for a few days later, but Ms. M. requested that the meeting be postponed because the physical therapist was unable to attend.  Hearing Decision at 18, ¶ 59; Record, Vol. VI at 1255-56.  Ms. M. learned for the first time at the March 2014 IEP team meeting that Falmouth had not been instructing O.M. using SPIRE.  *Ms. M*., Record, Vol. XIII at 2791.

52.     On April 17, 2014, Ms. M. informed Falmouth that she would be pulling O.M. out of her literacy program beginning on May 2, 2014, in order to have her receive private LiPS literacy instruction during the regular school day.  Hearing Decision at 18, ¶ 60; Record, Vol. VI at 1305.  She retained Kathleen Coffin to deliver the LiPS program.  Hearing Decision at 20, ¶ 73; *Ms. M*., Record, Vol. XIII at 2797.  Coffin is a private language therapist who has a bachelor's degree in psychobiology and has been trained in LiPS and other Orton-Gillingham literacy programs.  Hearing Decision at 20, ¶ 73; Testimony of Kathleen Coffin ("*Coffin*"), Record, Vol. XIII at 2713-14.

53.     The IEP team reconvened on May 1, 2014.  Hearing Decision at 18, ¶ 61; Record, Vol. VI at 1385-87.  Ms. M. pressed for the provision of LiPS instruction.  Record, Vol. VI at

1389.  However, the IEP team determined that, commencing in September 2014, Falmouth would provide the SPIRE literacy program, the Great Leaps methodologies, and additional phonemic goals with coordination between speech and language and the special education teacher based on the recommendations of Dr. Kaufman.  Hearing Decision at 18, ¶ 61; Record, Vol. VI at 1386. O.M.'s IEP, as amended after the May 1 meeting, continued to have the same DRA level 16 reading goal, but the anticipated mastery date was moved to October 2014.  Record, Vol. VII at 1436.  The IEP contained no breakdown or description of the literacy services to be offered to O.M.  *Id.* at 1439.

54.    In May 2014, O.M. achieved an instructional DRA level of 14 and an independent DRA level of 10.  Hearing Decision at 17, ¶ 57; *Mosca*, Record, Vol. XIV at 2917.

55.    On May 5, 2014, Coffin began working with O.M. on the LiPS program three times weekly for approximately one hour per session.  Hearing Decision at 21, ¶ 74; Record, Vol. III at 630.  Coffin also provided O.M. with a "Seeing Stars" program to learn common sight words, dubbed "Star Words" in that program.  Record, Vol. III at 630.  Coffin performed an informal assessment of O.M.'s strengths and weaknesses during her initial session with her.  Hearing Decision at 21, ¶ 74; Record, Vol. III at 630. She noted that O.M. was able to correctly identify "most" of the consonant sounds and "a few" of the vowel sounds and "had difficulty when the letters were combined into words[.]"  *Id.*

56.    Coffin testified that, unlike other Orton-Gillingham programs, LiPS has more of an oral-motor component and establishes sufficient phonemic awareness to enable students to use other literacy programs.  Hearing Decision at 21, ¶ 75; *Coffin*, Record, Vol. XIII at 2716.  She testified that the average student undergoes 120 hours of LiPS training, and that O.M. had about 50 hours of such training as of September 5, 2014.  Hearing Decision at 21, ¶ 75; *Coffin*, Record,

Vol. XIII at 2721.  She noted that O.M. sometimes had trouble maintaining attention and didn't "always last the whole hour."  Hearing Decision at 21, ¶ 75; *Coffin*, Record, Vol. XIII at 2718. She testified that, in her opinion, it is easier for O.M. to "feel" sounds in her mouth than to "tell her" about sounds.  Hearing Decision at 21, ¶ 75; *Coffin*, Record, Vol. XIII at 2721-22.  She testified that it would be inappropriate for O.M. to participate in a traditional language program or another Orton-Gillingham literacy program until she completed her LiPS training.  Hearing Decision at 22, ¶ 77; *Coffin*, Record, Vol. XIII at 2723.[4]

57.     Coffin testified that, at the outset of LiPS instruction, O.M. often guessed at words rather than using an effective decoding strategy; for example, she would read "so" as "saw" and "much" as "mush."  *Coffin*, Record, Vol. XIII at 2717.  She testified that O.M. quickly took to the LiPS oral-motor approach and began to learn to use the shape of her mouth (and the feeling of each sound in her mouth) to differentiate sounds.  *Id.* at 2720.  Coffin found her to be a "natural" at LiPS.  *Id.*

58.     In an undated progress report, Coffin noted that O.M. was able to correctly identify all of the consonant sounds and 11 vowel sounds on August 3, 2014, after 40 LiPS literacy sessions. Hearing Decision at 21, ¶ 76; Record, Vol. III at 631.  Coffin testified that she doesn't test using qualitative measures but only performs informal testing when a student seems "pretty solid." Hearing Decision at 21, ¶ 76; *Coffin*, Record, Vol. XIII at 2728.

---

[4] Coffin explained, "The premise is that reading is a man-made process, meaning brains weren't designed to read. We've had written language for about 5,000 years, we've had the alphabet I think less than 4,000, so that isn't enough time to develop pathways and actual spots in your brain that deal specifically with the written language so nobody is born a reader.  Some children and adults who have learned to read when they are exposed to the written words, their brains just sort of naturally can hear the sounds and the words so reading is fairly easy for them, and then there are students who are humans who aren't wired to hear that so this program [LiPS] actually establishes that in their brains and those pathways so that they can then move into reading programs."  *Coffin*, Record, Vol. XIII at 2714.  She elaborated, during her August 14, 2015, deposition: "I'm not against SPIRE, I think it's a great program.  [O.M.] just doesn't have what she needs to move into it.  SPIRE or a traditional language therapy assumes you have some phonemic awareness before you can start it."  Coffin Dep. at 84.

59.     Dr. Kaufman testified that O.M.'s improvement from nine vowel sounds to 11 and 21 consonant sounds to 24 following 40 private LiPS sessions was "fairly limited" and "somewhat disappointing."  Hearing Decision at 17, ¶ 54; *Kaufman*, Record, Vol. XIII at 2710.

60.     Ms. M. filed for a due process hearing on June 13, 2014.  Hearing Decision at 22, ¶ 78.  The hearing was held on September 5, 8, 9, and 12, 2014.  *Id.* at 1.  Seven witnesses testified: Ms. M., Dr. Kaufman, Dr. Jefferson, Coffin, Kucinkas, Mosca, and Weller.  *Id.*

61.     After receiving the hearing officer's adverse ruling, Ms. M. ceased providing O.M. with private LiPS instruction.  Ms. M. Decl. ¶ 5.  O.M. received only SPIRE reading instruction from November 2014 through April 2015.  *Id.* ¶ 4.

62.     On April 11, 2015, Coffin reevaluated O.M. after nearly six months away from the LiPS program.  Coffin Dep. at 9-10.  Coffin described O.M.'s regression since November 2014 as "catastrophic[.]"  *Id.* at 85.  She testified that: (i) in November 2014, O.M. could encode and decode words with up to five sounds and could divide multisyllable words for decoding, *id.* at 31, 40, (ii) as of April 11, 2015, O.M. was unable to encode or decode numerous three-letter words, *id.*, (iii) in November 2014, O.M. had mastered reading the first 150 sight words in the Seeing Stars program, but she could not read 13 of them in April 2015, *id.* at 71-72, (iv) in November 2014, O.M. had mastered spelling the first 25 Star Words and was working on mastering the next 25 on the list, *id.* at 59, and (v) in April 2015, she made two errors spelling the first 25 Star Words and 16 spelling the next 25, *id.* at 70-71.

### III.  Proposed Conclusions of Law

### A.  Provision of FAPE During 2013-14 School Year

### 1.  Alleged Failure To Provide Research-Based Reading Instruction

1.      Ms. M. argues, as she did before the hearing officer, that Falmouth failed to provide O.M. with appropriate research-based reading instruction during 2013-14.  *See* Parent's Brief at 18-21; Hearing Decision at 35-38.  She contends that this is so because, contrary to IDEA standards, the SPIRE program that Falmouth proposed to offer O.M. during that school year has not been subjected to peer-reviewed research.  *See* Parent's Brief at 19-21.

2.      The hearing officer rejected this argument, both as to the methodology proposed to be offered (SPIRE) and that actually offered (by Mosca) during the 2013-14 school year.  *See* Hearing Decision at 37.  I conclude that Ms. M. fails to carry her burden of demonstrating that his conclusion was contrary to law or without factual support.

3.      As Ms. M. points out, *see* Parent's Brief at 18, the IDEA requires that specialized services provided to children with disabilities be "based on peer-reviewed research to the extent practicable[,]" 20 U.S.C. § 1414(d)(1)(A)(i)(IV); 34 C.F.R. § 300.320(a)(4).  *See also, e.g.*, Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities ("Assistance to States"), 71 Fed. Reg. 46540-01, 46665 (Aug. 14, 2006) ("States, school districts, and school personnel must . . . select and use methods that research has shown to be effective, to the extent that methods based on peer-reviewed research are available."); *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 279 (3d Cir. 2012) ("[I]f it is practicable for a school district to implement a program based upon peer-reviewed research, and the school fails to do so, that will weigh heavily against a finding that the school provided a FAPE.").

4.      The hearing officer noted that, in *Ridley*, the parents of a child with a reading disability alleged that a school district had violated the IDEA by offering a reading program, "Project Read," that had not been thoroughly tested for its efficacy as to a child with their child's combination of disabilities.  *See* Hearing Decision at 36.  The parents had argued that the school district should have provided the Wilson reading system, a program proven to be effective for teaching students with learning disabilities similar to those of their child.  *See id*.  The *Ridley* court affirmed the district court's finding that, although Project Read might not have had the same level of peer review and support, it had been shown to be helpful in improving the reading skills of students with disabilities similar to those of the child, explaining:

> Given that the IDEA does not require an IEP to provide the optimal level of services, we likewise hold that the IDEA does not require a school district to choose the program supported by the optimal level of peer-reviewed research.  Rather, the peer-reviewed specially designed instruction in an IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential.

> ***

> In selecting special education programs, a school district must be able to take into account not only the needs of the disabled student, but also the financial and administrative resources that different programs will require, and the needs of the school's other non-disabled students.

*Id*. at 36-37; *Ridley*, 680 F.3d at 277, 279 (citations and internal quotations omitted).

5.      The hearing officer deemed this case factually similar to *Ridley*, noting that (i) Dr. Kaufman had testified that, although SPIRE had less direct research support, its construction was based upon research done on its programmatic elements, and he believed that SPIRE was reasonably calculated to benefit O.M., and (ii) Weller had testified that SPIRE offered a comprehensive reading program with phonological awareness concepts, including vocabulary, comprehension, encoding, spelling, phonemes, and fluency.  *See* Hearing Decision at 37.  He stated

that, based on this credible testimony, he found that the SPIRE program was based upon research and designed to provide educational benefit to O.M.  *See id*.

6.      He found that there was no evidence that the reading program actually offered to O.M. was not research-based, noting that Dr. Kaufman testified that he did not observe any instruction offered to O.M. that was either inappropriate or significantly inconsistent with the types of reading practice provided to students with reading disorders.  *See id*.

7.      Ms. M. challenges the factual premise that SPIRE is research-based by citing Dr. Kaufman's testimony that he "cannot think of one" direct empirical research study done on SPIRE, as well as an article by the Florida Center for Reading Research concluding that, although SPIRE contained elements of an effective reading program, "no empirical research has been conducted on the efficacy of the program."  Parent's Brief at 19 & n.8; *Kaufman*, Record, Vol. XIII at 2712. She challenges the legal conclusion that this case is analogous to *Ridley*, arguing that the hearing officer missed the point that, unlike the comparable reading programs at issue in *Ridley*, the SPIRE and LiPS programs have different aims.  *See* Parent's Brief at 20.  She cites Coffin's testimony that SPIRE exercises, rather than develops, phonemic awareness, whereas LiPS develops phonemic awareness so that children can move into traditional reading programs such as SPIRE. *See id*. at 19-20; Coffin Dep. at 82, 89.

8.      In a different section of her brief, Ms. M. also contends in passing that the literacy programming actually offered to O.M. during the 2013-14 school year was not research-based, and that the hearing officer lacked any basis to find that it was.  *See* Parent's Brief at 22.  However, the hearing officer made no affirmative finding that the program was research-based.  *See* Hearing Decision at 37.  Rather, he found that the party seeking relief (in this case, Ms. M.) bears the burden of persuasion in an administrative hearing challenging an IEP, *see id*. at 26, and that there was no

evidence that the literacy program provided to O.M. during the 2013-14 school year was *not* research-based, *see id*. at 37.

9.      While, in her main brief, Ms. M. again identified no evidence that the Mosca program lacked a research base, *see* Parent's Brief at 22, she attempted to do so in her reply brief, citing Dr. Kaufman's testimony that "leveled reading texts . . . tend[] to be less systematic and [less] linked to . . . what is true evidence-based reading instruction" and "tend not to be as embraced as other reading technologies for the development of remedial reading capacity[,]" and that guided reading using leveled texts is "not . . . by any means all of what a literacy specialist would recommend be done with someone like [O.M.,]" Plaintiff's Reply Memorandum of Law ("Parent's Reply") (ECF No. 26) at 3 n.1; *Kaufman*, Record, Vol. XIII at 2696, 2705.  Even if not too late, this proves too little.  Dr. Kaufman's comments do not indicate that the use of leveled reading texts is entirely without research-based support.  In any event, they do not address all elements of the literacy program provided to O.M. in 2013-14, including the Wilson FUNdations and Lexia programs.

10.      With respect to the SPIRE program, Falmouth correctly notes that even a complete failure to provide services based on peer-reviewed research is not automatically tantamount to the denial of a FAPE.  *See* School's Brief at 24-25.  As Falmouth points out, *see id*., the United States Department of Education clarified in the same rulemaking notice cited by Ms. M.:

> This [the directive to select and use methods that research has shown to be effective, to the extent that methods based on peer-reviewed research are available] does not mean that the service with the greatest body of research is the service necessarily required for a child to receive FAPE.  Likewise, there is nothing in the [IDEA] to suggest that the failure of a public agency to provide services based on peer-reviewed research would automatically result in a denial of FAPE.  The final decision about the special education and related services, and supplementary aids and services that are to be provided to a child must be made by the child's IEP Team based on the child's individual needs.

*** 

> A child with a disability is entitled to the services that are in his or her IEP whether or not they are based on peer-reviewed research.

Assistance to States, 71 Fed. Reg. at 46665.

11.     In any event, as Dr. Kaufman made clear, while the SPIRE program itself apparently has not undergone peer review, it incorporates elements that have. *See Kaufman*, Record, Vol. XIII at 2707, 2712. Accordingly, SPIRE fairly can be described as research-based.[5]

12.     Finally, on this record, Ms. M. does not succeed in demonstrating that the hearing officer erred in analogizing this case to *Ridley*. Coffin indeed felt strongly that O.M. could not effectively access SPIRE or other such reading programs without completing LiPS training. *See, e.g.*, Coffin Dep. at 82, 89. However, she alone expressed that opinion.

13.     While Dr. Kaufman stated that the LiPS program might be "particularly worth considering in this case[,]," Record, Vol. VI at 1225, his recommendation was that O.M. be provided a multisensory, systematic reading program, the "big four" being SPIRE, Orton-Gillingham, LiPS, and Wilson, *Kaufman, id.*, Vol. XIII at 2693-94, 2706-07. More to the point, he testified that many literacy specialists would view SPIRE as a program "reasonably calculated" to benefit a student like O.M., "such that it[]s use would also be a clinically informed choice to attempt." *Id.* at 2707. In addition, while he felt that LiPS was particularly worth considering for O.M., *see id.*, he acknowledged that one could reasonably criticize its use for children with

---

[5] As Falmouth notes, *see* School's Brief at 26-27 n.32, Ms. M.'s reliance on the conclusions drawn about SPIRE by the Florida Center for Reading Research is misplaced. Ms. M. neither introduced this material into evidence at hearing nor sought its admission in this court. I, therefore, sustain Falmouth's objection to its consideration. In any event, even if this material were admissible, it would not be outcome-determinative: It does not call into question Dr. Kaufman's testimony that, even if the SPIRE program itself has not undergone peer-reviewed research, it is based on elements that have.

seriously limited working memory (such as O.M.) because it requires learning an additional vocabulary simply to access the program, *see id*. at 2698.

14. Moreover, Weller, who was familiar with both LiPS and SPIRE, expressed the view that O.M. was ready for SPIRE. *See Weller,* Record, Vol. XIV at 2936. She described SPIRE as a comprehensive reading program that includes instruction in phonemic awareness, stating "there are lots of ways to develop" phonemic awareness skills with students. *Id*.

15. At bottom, as in *Ridley*, this is a case involving disagreement over which of competing multisensory, systematic reading programs to offer a disabled student.

16. Ms. M. fails to demonstrate that either the literacy program proposed for O.M. during the 2013-14 school year or the literacy program actually provided lacked an appropriate research base.

### 2. Alleged Failure to Provide O.M. with a FAPE in 2013-14

17. This court has recently observed:

> In addition to developing an IEP that is reasonably calculated to provide meaningful educational benefits, a school district is required to implement the IEP in accordance with its requirements. Although perfect implementation is not necessarily required, courts have found that the failure to implement a material or significant portion of the IEP can amount to a denial of a free, appropriate public education.

*S.D. v. Portland Pub. Sch.*, No. 2:13-cv-00152-JDL, 2014 WL 4681036, at *6 (D. Me. Sept. 19, 2014) (citations and internal punctuation omitted). While the question of whether an IEP is reasonably calculated to provide a FAPE is viewed from an *ex ante* perspective, that of whether a failure to implement portions of an IEP led to a deprivation of a FAPE is viewed from an *ex post* one. *See, e.g., Mr. C & Mrs. C ex rel. KC v. Maine Sch. Admin. Dist. No. 6*, Civil No. 06-198-P-H, 2007 WL 4206166, at *26 (D. Me. Nov. 28, 2007) (rec. dec., *aff'd* Mar. 17, 2008).

18.     Ms. M. appears to have raised both types of challenges at hearing, asserting that Falmouth denied O.M. a FAPE in 2013-14 by failing to implement the SPIRE reading program and by proposing the use of SPIRE instead of LiPS.  *See* Hearing Decision at 22-23.

19.     The hearing officer agreed that Falmouth committed a procedural violation in failing to implement the SPIRE literacy program as called for in O.M.'s 2013-14 IEP.  *See id.* at 31.  However, after examining the type and quality of literacy instruction actually provided and the progress that O.M. made in the face of her cognitive limitations, he determined that the default had not deprived her of a FAPE.  *See id.* at 35 ("Despite [Falmouth's] procedural violation by not providing the SPIRE program as determined in the October 31, 2013 IEP, I find that [Falmouth] provided [O.M.] with a FAPE.  The literacy program delivered was reasonably calculated to provide educational benefit for [O.M.].  Taking [her] abilities into account, I find that [she] achieved demonstrable improvement in her literacy skills.").[6]

20.     In passing, the hearing officer suggested that any argument that the 2013-14 IEP was not reasonably calculated to provide a FAPE also was without merit, stating:

> Even if LiPS, SPIRE or some other methodology *could have* increased [O.M.'s] gains, the benefit conferred need not reach the highest attainable level or even the level needed to maximize the child's potential.  As the First Circuit stated in *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083[] (1st Cir. 1993)[,] the law does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and adolescents.  *Id.* at 1086.  The [IDEA] sets more modest goals: it emphasizes an appropriate, rather than ideal, education; it requires an adequate, rather than optimal, IEP.  Appropriateness and adequacy are terms of moderation.  *Id.* at 1089.

*Id.* at 34-35 (emphasis in original).

---

[6] In reaching that conclusion, the hearing officer rejected Falmouth's argument that Ms. M. prevented it from implementing SPIRE, explaining, "The evidence in this case does not support a finding that [Ms. M.'s] behavior rose to a level of parent obstructionism as suggested by [Falmouth], thereby relieving it of it[]s obligation to fulfill the requirements of [O.M.'s] IEP."  Hearing Decision at 30 (footnote omitted).

### a.   Failure To Implement SPIRE Program

21.    Ms. M. contends that the hearing officer's ruling that Falmouth's failure to implement the SPIRE program was merely a procedural violation that did not undermine her education is wrong as a matter of both fact and law.  *See* Parent's Brief at 21.  She asserts that Falmouth offered O.M. a hodgepodge of reading programs, included Wilson FUNdations, screen-based Lexia, and "a high dose of 'leveled texts,'" that failed to develop O.M.'s ability to decode words using phonetic skills.  *Id*. at 21-22.  Falmouth counters that the hearing officer erred in finding a procedural violation because the provision of SPIRE was not set forth within the four corners of the 2013-14 IEP.  *See* School's Brief at 20-23.  It adds that, even if the default amounted to a procedural evaluation, the hearing officer correctly deemed it harmless given the quality of the reading program actually provided.  *See id*. at 23-24.  I conclude that the hearing officer correctly determined that Falmouth's failure to provide the SPIRE program amounted to a procedural violation but that the violation did not deprive O.M. of a FAPE.

### i.   Was There a Procedural Violation?

22.    There is no dispute that mention of SPIRE – or for that matter, any reading methodology – is absent from O.M.'s 2013-14 IEP as determined by her IEP team on October 31, 2013.  The relevant section of that document merely provides for "Specially Designed Instruction Literacy & Math" for eight hours and 45 minutes per week.  Record, Vol. IV at 934.  However, Falmouth sent Ms. M. a November 5, 2013, Written Notice in which it stated, in a section describing "the action(s) regarding the referral, evaluation, identification, programming or placement proposed or refused by the SAU [School Administrative Unit]: "Provide 60 minutes per day reading instruction Spire in an alternative setting close to reg[ular] classroom[.]"  *Id*. at 862-63.

23.     Falmouth argues that a school's duty is to implement an IEP, not a Written Notice, citing *Millay ex rel. YRM v. Surry Sch. Dep't*, 707 F. Supp.2d 56, 60 (D. Me. 2010), for the proposition that this court has recognized that the purpose of a Written Notice is to give parents notice of what a school proposes or plans to do with a student.  *See* School's Brief at 22.  It adds that neither federal nor state regulations require a school to specify a teaching methodology in an IEP.  *See id*. at 22 n.25 (citing 20 U.S.C. § 1414(d)(1)(A)(ii); Maine Unified Special Education Regulation, Code Me. R. 05-071 ch. 101 (2015) ("MUSER"), § IX.3.A.2).  It asserts that, in *Hampden-Wilbraham*, the United States District Court for the District of Massachusetts rejected an argument identical to that of Ms. M., holding that a school did not fail to implement a material portion of a student's IEP when it unilaterally changed methodologies.  *See id*. at 23; *see also Hampden-Wilbraham*, 715 F. Supp.2d at 197 ("[T]here is no indication that the changes that were made to the methodologies used deviated from the requirements of the IEP.  It is clear that the specialists did determine at certain times to focus on using one methodology over another, and would change that focus as they deemed it necessary. . . .  The language of the IEP . . . gave the school this flexibility and nothing in the IEP restricts its ability to make these decisions.").

24.     Nonetheless, as this court observed in *Millay*, "The First Circuit has not adopted the so-called 'four corners' rule and allows reviewers to consider evidence extrinsic to the written IEP at least when there are 'obvious gaps' in the IEP."  *Milla*y, 707 F. Supp.2d at 61 (citation omitted).  While a court typically should not find it necessary "to go beyond the four corners of the [IEP] document" to "determine whether [a teaching] methodology is required under the terms of the IEP[,] . . . vagueness in the instrument with respect to how its goals are to be achieved may require that the court turn to extrinsic evidence to determine the intent of those who formulated

the plan." *John M. v. Board of Educ. of Evanston Twp. High Sch. Dist. 202*, 502 F.3d 708, 715 (7th Cir. 2007).

25.     As Ms. M. argues, *see* Parent's Reply at 5, "it would exalt form over substance to ignore information known to parents and administrators simply because it was not contained in the four corners of the IEP[,]" *John M.*, 502 F.3d at 716 (citation and internal quotation marks omitted).  While "[a] methodology not mentioned in the plan may well indicate that those who formulated the plan did not consider that particular methodology a necessary component to the plan[,]" it is also possible that, despite the omission in the IEP of that methodology, the parties regarded it "as an essential part of the plan[.]" *Id.*

26.     While a school district need not specify a particular methodology in an IEP, it must set forth "[a] statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child[.]"   MUSER § IX.3.A.1.d.  In merely stating that O.M. would receive specially designed instruction in literacy, O.M.'s IEP shed no light on how her literacy goals were to be achieved.  *See* Record, Vol. IV at 934.  Yet, the Written Notice, sent *after* the IEP team met to determine her 2013-14 IEP, flatly stated that Falmouth would provide SPIRE.  *See id.* at 863.  That document, in essence, filled the hole left by the IEP, leaving no doubt that the IEP team had agreed on October 31, 2013, to provide that specific methodology to O.M.

27.     By contrast, the IEP at issue in *Hampden-Wilbraham* stated that the student "would work in discrete trial learning *based on his development needs*" and, while not specifying any particular methodology, detailed the type of methodology and delivery he required.  *Hampden-Wilbraham*, 715 F. Supp.2d at 196 (citation and internal quotation marks omitted) (emphasis in original).  It noted, for instance, that the student required "a language based curriculum with

explicit instructions" and "a multi-modal approach that pairs as many modalities as possible." *Id*. (citation and internal quotation marks omitted).  It stated that the methodologies generally included "individual instruction, models, prompts, visuals, [and a] multi-sensory approach." *Id*. (citation and internal quotation marks omitted).  Against that backdrop, the court determined that the IEP permitted flexibility in choice of methodology.  *See id*. at 197.

28.     The hearing officer, thus, correctly determined that Falmouth had violated O.M.'s IEP in not providing SPIRE.  Falmouth underscores that it refrained from implementing that program because of Ms. M.'s disagreement with its use.  *See* School's Brief at 23 & n.27.  It acknowledges, and seemingly does not challenge, the hearing officer's finding that Ms. M.'s behavior did not rise to the level of obstructionism found by the First Circuit to excuse a school's noncompliance with a student's IEP.  *See id*. at 23 n.27.  However, it argues that, "under principles of equity, a school district should not be found to violate the IDEA when the school goes along with a parent request not to provide a particular program[,]" a proposition for which it cites *Doe v. Defendant I*, 898 F.2d 1186, 1189 n.1 (6th Cir. 1990).  *Id*.  *Doe* is distinguishable: it concerned a parent's complaint that a school had completely failed to develop an IEP in circumstances in which the parent had requested that the school allow the child to perform on his own for a while. *See Doe*, 898 F.2d at 1189 & n.1.  The hearing officer correctly determined that Ms. M.'s disagreement did not excuse Falmouth's failure to implement the SPIRE portion of O.M.'s IEP.

### ii.  Did the Procedural Violation Deny O.M. a FAPE?

29.     Ms. M. argues that Falmouth's failure to provide SPIRE to O.M. denied her a FAPE in that it amounted to a complete failure to implement the most critical literacy services promised to her by the IEP team.  *See* Parent's Brief at 22.  She quotes *Abney v. District of Columbia*, 849 F.2d 1491, 1496 n.3 (D.C. Cir. 1988), for the proposition that "the complete failure to implement

35

a child's IEP . . . would undoubtedly . . . result in a failure to provide the child with a 'free appropriate public education[,]'" a result that "obtains because the statute defines a 'free appropriate public education' to include an educational program conforming to a child's IEP." *Id.* at 22 (quoting *Abney*, 849 F.2d at 1496 n.3).

30.     She complains that the hearing officer "danced around this issue by asserting that Falmouth's provision of other literacy instruction, which was never discussed or determined to be appropriate by the IEP Team, was sufficient under the IDEA." *Id.* at 23.  She asserts that neither Wilson FUNdations nor Lexia is the type of systematic, phonics-based reading program that O.M. required: FUNdations is a flashcard program, and Lexia is a computer program that O.M. could not complete without the assistance of an educational technician or teacher.  *See id.*  She notes that Dr. Kaufman testified that the challenge with screen-based programs such as Lexia for students with O.M.'s profile is that, because students have to be able to maintain independent focus on the program, "there has to be somebody, either an educational technician or a resource teacher paying attention to the level of attention a student is showing[.]"  *Id.* at 23 & n.16 (quoting *Kaufman*, Record, Vol. XIII at 2694).

31.     Unlike *Abney*, this case does not involve a complete failure to implement a child's IEP.  As Falmouth observes, *see* School's Brief at 13-14, O.M.'s IEP encompassed an array of services, including occupational therapy, speech therapy, physical therapy, adaptive physical education, and specially designed instruction in math, as well as supplementary aids and services and a provision that O.M. be educated in a mainstream setting 58 percent of the time, *see* Record, Vol. IV at 934-37, none of which is in dispute.

32.     Ms. M. counters that an inappropriate reading program, alone, can suffice to deny a FAPE, pointing to this court's recent award in *S.D.* of compensatory relief for that very default.

*See* Parent's Reply at 4 n.2.  She reasons that "[r]eading forms the basis for much of a student's academic achievement and functional performance, so failure to receive appropriate services in that area is especially critical to a student's overall performance in school."  *Id.*

33.    Finally, Ms. M. goes so far as to argue that the hearing officer erred as a matter of law in characterizing the failure to implement SPIRE as a mere procedural violation.  *See id.* at 5-6.  She posits that, "[w]hile an analysis of harm may be necessary for run-of-the-mill procedural defaults, such as a failure to provide required notices or a delay in processing a referral or setting up an evaluation . . ., this is not a proper legal approach to the type of violation Ms. M. has proved in this case."  *Id.* at 5.  She argues that "whatever programming [Falmouth] offered instead could not possibly satisfy the statutory requirement for FAPE (and the hearing officer erred as a matter of law in concluding to the contrary)."  *Id.* at 6.

34.    Tellingly, Ms. M. cites no authority for the proposition that a failure to implement even substantive portions of an IEP is a *per se* denial of FAPE.  *See id.* at 5-6.  Such an approach flies in the face of that followed by this court.  *See, e.g., S.D.*, 2014 WL 4681036, at *7-*8 (analyzing materiality of failure to implement IEP); *Mr. & Mrs. C,* 2007 WL 4206166, at *26 (same); *see also, e.g., L.J. ex rel. N.N.J. v. School Bd. of Broward Cty.*, 850 F. Supp.2d 1315, 1320 (S.D. Fla. 2012) (adopting materiality standard; noting, "[I]f a child is not provided the reading instruction called for by the IEP and there is a shortfall in the child's reading achievement, that would tend to show the failure to implement the IEP was material.  Conversely, if the child performed at or above the anticipated level, that would tend to show that the shortfall in instruction was not material.").

35.    To the extent that Ms. M. cites *S.D.* for the proposition that an inappropriate reading program alone can suffice to deny a student a FAPE, *see* Parent's Reply at 4 n.2, *S.D.* is

distinguishable in that the IEP at issue there called *solely* for the provision of literacy services to address reading and anxiety disorders, *see S.D.*, 2014 WL 4681036, at 1.  Nonetheless, even assuming that, in a case such as this in which a child's IEP calls for an array of services, the provision of an inappropriate reading program alone could amount to a denial of a FAPE, Ms. M. fails to demonstrate that the hearing officer erred in concluding otherwise on these facts.

36.   The hearing officer observed that (i) Mosca instructed O.M. in literacy for approximately 60 minutes per day on a one-on-one basis using level system books, the Wilson FUNdations fluency program, and the computer-based Lexia phonics program, (ii) Weller worked with O.M. for three 30-minute pullout sessions weekly on goals established in her IEP, including speech sounds, syllables, accuracy, verbal expression, multiple definition words, and word endings, (iii) Weller met weekly with other staff to coordinate and reinforce O.M.'s literacy skills and training, (iv) Dr. Kaufman, who observed Mosca doing phonetic and word family work as well as "guided oral reading" with O.M. in January and February 2014, testified that, while he had other recommendations to improve O.M.'s literacy instruction, he did not observe any instruction offered to her by Falmouth that was either inappropriate or significantly inconsistent with the types of reading practice done for students with reading disorders,[7] (v) Dr. Kaufman noted that, while the computer-based Lexia program requires an educational technician or resource teacher to pay close attention to a student while delivering the training, it can be "quite effective and powerful," and (vi) Mosca testified that she provided one-on-one support to O.M. while providing the Lexia program.  *See* Hearing Decision at 31-33 (quoting *Kaufman*, Record, Vol. XIII at 2694).[8]

---

[7] As Falmouth notes, *see* School's Brief at 15-16, Dr. Kaufman testified that (i) O.M. was performing at a level one would expect in reading, given her cognitive profile, *see Kaufman*, Record, Vol. XIII at 2704-05, and (ii) the approaches used by Mosca to literacy instruction were being used effectively by special education teachers with students like O.M., *see id*. at 2694, 2705-06.

[8] As Falmouth points out, *see* School's Brief at 15, Mosca testified that, through the use of the DRA leveled books, she measured O.M.'s performance in story prediction, word decoding, grammar, comprehension of text, oral reading

37. The hearing officer added that it was undisputed that O.M. had significant disabilities: her cognitive scores were in the "extremely low" range, with scores in Phonological Awareness and Early Written Language in the below-average range, and, as of October 31, 2013, her ability to read independently was at a DRA level 8, and her instructional level was at a DRA level 10. *See id.* at 33. He added that, Dr. Kaufman testified, based on his 2014 observations and evaluation, that O.M. had "fairly substantial challenges across intellectual, processing, academic, and self-regulatory domains[,]" "substantially limited oral reading skills as compared to age and grade norms[,]" and "low general intelligence with substantial working memory difficulties[.]" *Id.* (quoting *Kaufman*, Record, Vol. XIII at 2688, 2691, 2703).

38. The hearing officer concluded that, despite O.M.'s challenges, she made demonstrable gains in literacy skills, noting that (i) Mosca emailed Ms. M. on January 10, 2014, to report that O.M. was reading at a DRA level 13, (ii) Mosca emailed Ms. M. on February 14, 2014, stating that O.M. was "doing great" reading consonants and had begun reading DRA level 14 books, to which Ms. M. responded that she was "glad that [O.M.] was making limited progress[,]" (iii) Weller testified that O.M. had a beneficial year and made reasonable progress, (iv) Dr. Jefferson observed O.M. working on her specially designed literacy program and testified that she was oriented to the instruction and demonstrated 80 percent accuracy in her skills,[9] and (v) Mosca noted that O.M. was reading at a DRA level 14 as of March 12, 2014, and had achieved an instructional DRA level of 14 and an independent DRA level of 10 by May 2014. *See id.* at 34. (quoting Record, Vol. V at 1101-02).

---

fluency, and story sequencing, *see Mosca*, Vol. XIV at 2911-13, that the Lexia program worked on segmenting, consonants, vowels, and medial word skills, *see id.* at 2913, and that she used Wilson FUNdations to address word and sound recognition with flashcards, *see id.* at 2914.

[9] As Falmouth observes, *see* School's Brief at 16, Dr. Jefferson described O.M.'s educational team as "energetic, creative, organized, focused and highly skilled in their efforts to promote [O.M.'s] learning and engagement in the school community[,]" Record, Vol. VI at 1198.

39.     In short, the hearing officer supportably found that O.M. made demonstrable progress, commensurate with her cognitive profile, pursuant to the reading program actually provided in 2013-14, rendering Falmouth's failure to implement the SPIRE program harmless.

### b.  Omission To Provide for LiPS Program

40.     Ms. M. finally argues that the post-hearing evidence filed in this court underscores the hearing officer's errors in (i) ruling that O.M. received a FAPE during the 2013-14 school year and (ii) denying her requested relief of reimbursement of expenditures for O.M.'s private LiPS tutorials and the addition of LiPS tutorial services to O.M.'s IEP.  *See* Parent's Brief at 24.  She notes that Coffin described O.M.'s skill loss since November 2014, when O.M. ceased private LiPS tutorials and began Falmouth's SPIRE program, as "catastrophic."  *Id*. (quoting Coffin Dep. at 85) (footnote omitted).  She argues that this evidence confirms that O.M. lacked the basic skill set to benefit from SPIRE until such time as she completed her training in LiPS.  *See id*. at 24-25.  Indeed, she characterizes the "principal issue in this IDEA case [as] whether O.M. . . . is entitled to receive reading instruction using the [LiPS] program."  *Id*. at 1.

41.     Falmouth counters that the central issue in considering whether it met its duty to provide O.M. a FAPE during the 2013-14 school year – the only year at issue – is whether the program actually delivered to her, which was neither SPIRE nor LiPS, provided a FAPE.  *See* School's Brief at 9.  It points out that the issue of whether LiPS should be used for O.M. did not even come up for discussion by school officials until the team meeting of May 1, 2014, near the end of the 2013-14 school year.  *See id*. at 28.  It argues that, in any event, "[t]he law is clear that selection of the appropriate methodology for implementing the services in the IEP is generally left up to schools and is not selected by parents."  *Id*. at 21 (citing *Lessard*, 518 F.3d at 28-29; *Brougham v. Town of Yarmouth*, 823 F. Supp. 9, 16 (D. Me. 1993)).  It points out that, while

O.M.'s IEP team again offered SPIRE for the 2014-15 school year, and O.M. began receiving SPIRE programming in November 2014, the family has failed to meet the mandatory IDEA exhaustion requirement for pursuing any claim regarding that year. *See id.* at 29.

42.     It argues that, in any event, Coffin's deposition testimony does not undercut the appropriateness of the decision to instruct O.M. using SPIRE during the 2014-15 school year. *See id.* at 30. It states that, despite Coffin's assertion that O.M. suffered a catastrophic regression while receiving SPIRE instead of LiPS, test scores do not bear this out. *See id.* at 30 n.35.

43.     Falmouth is correct that, in this litigation, only the 2013-14 school year is at issue. *See* Hearing Decision at 42. In my view, the question of whether O.M.'s 2013-14 IEP, insofar as it provided for SPIRE instruction, was reasonably calculated to provide her with a FAPE will be moot if the court agrees that, with the benefit of the literacy instruction actually provided, O.M. received a FAPE. Nonetheless, in the event that the court disagrees with either of those conclusions, I consider whether O.M.'s 2013-14 IEP was reasonably calculated to provide her with a FAPE.

44.     As Falmouth suggests, *see* School's Brief at 14, 21-22, in disputing the choice of a literacy methodology as part of a comprehensive array of IEP services, Ms. M. faces an uphill battle. The IEP team chose to provide SPIRE to O.M. during the 2013-14 school year. Ms. M. disagreed with that decision and later, with the benefit of Dr. Kaufman's report and recommendations, began to advocate for the provision of LiPS. However, as this court has noted, "*Rowley* and its progeny leave no doubt that parents, no matter how well-motivated, do not have a right under the [IDEA] to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child." *Brougham*, 823 F. Supp. at 16 (citation and internal quotation marks omitted). More to the point, in rejecting a

claim regarding a failure to provide the LiPS program to a child with significant cognitive delays, the First Circuit stated:

> The appellants' next claim relates to Stephanie's proposed reading program.  In their view, the School District's literacy methodology produced a level of progress categorically beneath what their daughter was capable of attaining.  Since superior methodologies were readily available (in particular the LiPS system advocated by Dr. Kemper), the School District's chosen methodology denied Stephanie a FAPE.
>
> It is difficult to prevail on a claim of this nature.
>
> ***
>
> *Rowley* sends a very clear message.  The short of it is that courts are entrusted with ascertaining the adequacy of an IEP's educational components but not with weighing the comparative merits of the components when stacked against other heuristic methods.

*Lessard*, 518 F.3d at 28-29.

45.     Ms. M. rejoins that "[d]eference to a school's choice of methodology is proper only when there are competing methods, each of which is based on peer-reviewed research and would be appropriate for the child."  Parent's Reply at 7 n.3.  Yet, as discussed above, the record reveals that SPIRE was research-based, in the sense that it incorporated elements that had undergone peer-reviewed research.  As also noted above, there was no consensus among pedagogues/experts at hearing that, as of the fall of 2013, SPIRE was inappropriate for O.M.  While O.M.'s LiPS tutor, Coffin, felt that O.M. could not benefit from SPIRE until she completed her LiPS instruction, Dr. Kaufman indicated that SPIRE was one of four appropriate multisensory phonological programs and that many literacy specialists "would see SPIRE as being a program that [was] reasonably calculated in many respects to benefit a student like [O.M.] such that it[]s use would also be a clinically informed choice to attempt."  *Kaufman*, Record, Vol. XIII at 2707.  Weller testified that, in her opinion, O.M. was ready for SPIRE.  *See Weller*, Record, Vol. XIV at 2936.  While Dr. Kaufman felt that LiPS deserved particular consideration for O.M., he never testified that she could

not receive meaningful benefit from the other recommended programs, including SPIRE, until such time as she completed tutoring in LiPS.  He described O.M.'s improvement from nine vowel sounds to 11, and 21 consonant sounds to 24, following 40 private LiPS sessions as "fairly limited" and "somewhat disappointing."  *Kaufman*, Record, Vol. XIII at 2710.

46.    Ms. M.'s supplemental evidence does not undermine this conclusion.  While this court has held progress evidence relevant, despite its *ex post* nature, to the question of whether, *ex ante*, an IEP was reasonably calculated to provide a student with a FAPE, *see, e.g., C.G. & B.S. ex rel. A.S. v. Five Town Cmty. Sch. Dist.*, 436 F. Supp.2d 181, 186 (D. Me. 2006), "neither the [IDEA] nor reason countenance Monday Morning Quarterbacking in evaluating the appropriateness of a child's placement [or whether an IEP is reasonably calculated to provide a FAPE]."  *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 762 (3d Cir. 1995) (citation and internal punctuation omitted).  *See also, e.g., Roland M*., 910 F.2d at 992 ("In striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated.").

47.    At the time the IEP at issue was promulgated, there was no discussion or consideration of LiPS.  Nor is there reason to believe that, had LiPS then been considered, it would have been apparent that O.M. could not receive benefit from SPIRE until she completed training in LiPS.  Indeed, months later, during hearing, Dr. Kaufman indicated that SPIRE was an informed and reasonable choice for a student like O.M.  Thus, even assuming that Ms. M.'s supplemental evidence demonstrates that SPIRE was a failure for O.M. absent completion of LiPS, it would be an exercise in Monday Morning Quarterbacking to conclude on that basis that O.M.'s 2013-14 IEP was not reasonably calculated to provide her with a FAPE.

48.     In any event, as Falmouth points out, *see* School's Brief at 30-31 & n.35, despite Coffin's testimony that O.M. suffered a "catastrophic" regression in literacy skills after ceasing LiPS tutoring and commencing the SPIRE program, Coffin Dep. at 85, and O.M.'s decline in ability to read and spell Seeing Stars words, some results of Coffin's testing indicate that O.M. made progress as of fourth grade.  For example, a Quick Word Recognition Grade Placement Test administered by Coffin in March 2015 placed O.M. at the end of second grade/beginning of third grade, a clear gain from a mid-first-grade reading level as of May 2014.  *Compare* Coffin Dep. at 74-75 & Exh. D thereto *with* Record, Vol. V at 1101-02.  While O.M. could identify 11 of 56 vowel sounds in August 2014, *see* Record, Vol. III at 631, she could identify 20 in April 2015, *see* Exh. A to Coffin Dep.  She could identify no welded sounds as of March 2014, *see* Record, Vol. VI at 1219, but could identify 13 of 16 as of April 2015, *see* Exh. A to Coffin Dep.[10]

49.     As the hearing officer noted, "[e]ven if LiPS, SPIRE or some other methodology *could have* increased [O.M.'s] gains, the benefit conferred need not reach the highest attainable level or even the level needed to maximize the child's potential."  Hearing Decision at 34-35 (emphasis in original) (citing *Lenn*, 998 F.2d at 1086).

50.     The supplemental evidence fails to demonstrate that the provision of SPIRE was not reasonably calculated to provide O.M. with meaningful benefit – or, put differently, that O.M. was unable to obtain any benefit from SPIRE until completing LiPS.

---

[10] Falmouth also points out apparent discrepancies between Coffin's description of O.M.'s regression per recent testing, as set forth in a declaration filed in support of Ms. M.'s motion to supplement the record, and the underlying test results. *See* School's Brief at 30 n.5.  Coffin stated in her declaration that, while in November 2014, O.M. "could encode and decode words with up to five sounds" and "divide multi-syllable words for decoding[,]" she was unable as of April 11, 2015, "to encode or decode numerous three-letter words, all of which she had mastered five months ago[.]"  Declaration of Kathleen Coffin (ECF No. 11-3), attached to Plaintiff's Motion To Permit Presentation of Additional Evidence (ECF No. 11) ¶ 8.  However, Falmouth points out that, during testing administered by Coffin on March 7, 2015, and April 11, 2015, O.M. read all eight three-letter words in Exhibit C, *see* Coffin Dep. at 47 & Exh. C thereto, all nine three-letter words in Exhibit E, *see* Coffin Dep. at 48-49 & Exh. E thereto, the only five-letter word presented to her, *see* Coffin Dep. at 49-50 & Exh. C thereto, and several words with more than one syllable, *see* Coffin Dep. at 44-45 & Exhs. C, D, & E thereto.

## B.  Waiver of Claims During Portion of 2013-14 School Year

51.     The conclusion that O.M. was provided with a FAPE during the 2013-14 school year obviates the need to consider whether Ms. M. waived any claim for relief for a portion of that year.  However, in the event the court disagrees that O.M. was provided with a FAPE, I reach that question.

52.     The hearing officer found that, even applying the strict test set forth in *W.B. v. Matula*, 67 F.3d 484 (3d Cir. 1995), *abrogated on other grounds*, *A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir. 2007), Falmouth met its burden of proving its affirmative defense that Ms. M. waived claims under the IDEA for the period from September 1, 2013, through December 17, 2013.  *See id.* at 26-29.[11]

53.     The *Matula* court held that a court should "inquire into the totality of the circumstances surrounding execution of [an IDEA settlement agreement], and . . . decline to enforce the agreement unless its execution was knowing and voluntary."  *Matula*, 67 F.3d at 497. It stated that relevant factors included "whether (1) the language of the agreement was clear and specific; (2) the consideration given in exchange for the waiver exceeded the relief to which the signer was already entitled by law; (3) the signer was represented by counsel; (4) the signer received an adequate explanation of the document; (5) the signer had time to reflect upon it; and (6) the signer understood its nature and scope."  *Id.*

54.     The hearing officer found that Ms. M. checked and initiated a handwritten box next to a paragraph that indicated she wished to withdraw her hearing with prejudice, which stated, "all hearing issues were settled in a written resolution or mediation agreement[,]" (ii) while the

---

[11] While Falmouth bore the burden at hearing of proving its affirmative defense, Ms. M., as the party seeking relief in this forum, bears the burden of proving that the hearing officer's determination on that point was contrary to law or without factual support.  *See, e.g., Mr. & Mrs. R.*, 176 F. Supp.2d at 23.

paragraph on the form that Ms. M. did not sign contained redundant language regarding withdrawal of the hearing request with or without prejudice, Ms. M. did not testify that she was confused by that choice, (iii) Ms. M.'s amended hearing request alleged that Falmouth failed to provide effective instruction from 2011 to the present, and the evidence supported a finding that Ms. M. knew that, by dismissing her request, she was dismissing her claim for compensatory education damages for those alleged instructional failures, (iv) while Ms. M. was not represented by counsel at the time she signed the withdrawal form, she had recently worked with an advocate who had provided advice on other matters, and she was an experienced special education teacher, more sophisticated than most parents with respect to special education issues, (v) she knew how to avail herself of legal advice or advocacy if she had any questions about the terms or ramifications of the withdrawal request, (vi) the form was signed in conjunction with a December 13, 2013, settlement letter outlining 10 things Falmouth had agreed to do, ranging from student evaluations to specific communication and notice protocols, and Kucinkas wrote that "based upon this agreement" Ms. M. would withdraw her hearing request, (vii) there is no evidence that Falmouth failed to comply with those settlement terms, (viii) the evidence did not support a conclusion that Ms. M. was given insufficient time to review the December 13, 2013, agreement before signing the withdrawal request form on December 17, 2013, and (ix) Ms. M.'s testimony that she was confused about the waiver form or believed she was preserving claims prior to December 17, 2013, was not credible: on the one hand, she testified that she "thought all our issues were settled" and she "didn't want to go into a hearing on January 6[th][,]" on the heels of the busy holidays; on the other, she stated that she never intended to release her past claims.  Hearing Decision at 27-28 (quoting *Ms. M.*, Record, Vol. XIII at 2789, 2808).

55.     Ms. M. challenges this finding, asserting that the form that she signed was hopelessly confusing because it did not even include checkboxes for two of the three options, and the option to withdraw a hearing request both with and without prejudice misleadingly indicated that the hearing would still go forward despite the request to withdraw it, stating, "The outstanding hearing issues will be part of the hearing."  Parent's Brief at 27; Record, Vol. V at 1059.  She asserts that she was endeavoring to fill out the form to avoid the upcoming hearing but not waive all of her daughter's existing claims.  *See* Parent's Brief at 27.  She argues that her background in special education was irrelevant under *Matula*, which presumes an inherent power and knowledge differential favoring a school district.  *See id*.  She contends that all of the *Matula f*actors favored her: in addition to being confused by the form, she received consideration (further evaluation of her daughter) that was paltry in comparison with what she could have obtained by way of compensatory services for that time period, she was unrepresented by counsel, Kucinkas testified that neither he nor anyone else explained the document to her, she did not have time to reflect on the document, and, contrary to the hearing officer's finding, she testified that she was confused as to its nature and scope and elected the "with prejudice" option "because . . . the main thing I wanted was the testing so I could go forward in the spring and re-file and we settled on that."  *Id.* at 28 & n.23 (quoting *Ms. M*., Record, Vol. XIII at 2807).

56.     Falmouth expresses doubt that the First Circuit would adopt the heightened *Matula* standard with respect to IDEA waivers but argues that, in any event, the hearing officer correctly determined that Ms. M.'s waiver was knowing and voluntary.  *See* School's Brief at 32-33.  It points out that (i) the form, which emanated from the MDOE, not Falmouth, defined "with prejudice" as "[a]ll hearing issues were settled in a written Resolution or Mediation Agreement[,]" (ii) it would seem that laypersons generally, and especially a reasonably well-educated one like

47

Ms. M., would understand that if an issue has been "settled," a person cannot come back later and present the same disagreement, (iii) Falmouth never pressured her to sign the form, (iv) she had several days to consider it, and (v) she received the consideration of expensive evaluations of O.M. by some of the best evaluators in the region in exchange for the release of claims for the limited period from September 1 through December 17, 2013. *See id*. (quoting Record, Vol. V at 1059). Finally, Falmouth argues that, if Ms. M.'s testimony somehow establishes that she did not intend to waive past claims, it should also establish that she intended to mislead Kucinkas into believing that she did: when asked if she told Kucinkas during their settlement discussions that she was planning on refiling her request for due process in the spring, she stated, "No, because he wouldn't like that." *Id*. at 34 & n.37 (quoting *Ms. M*., Record, Vol. XIII at 2808).

57.     With due deference to the hearing officer's credibility determination, I find no basis on which to disturb his resolution of this issue.  While a parent's level of sophistication is not among factors listed in *Matula*, the list is not exhaustive – a court is to consider the totality of the circumstances.  *See Matula*, 67 F.3d at 497.  In my view, Ms. M.'s sophistication in special education matters was highly relevant to this analysis.  She testified, for example, that she had previously worked as an IEP compliance person for Deering High School in Portland, Maine: "I did all the written notices, the teachers did the IEPs, I had to check the IEPs for compliance, correct them, send them back to them and then they went through me before . . . they went out." *Ms. M*., Record, Vol. XIII at 2735.

58.     As Falmouth points out, the form that Ms. M. signed defined "with prejudice" in a manner that should have been understandable to most laypeople and certainly to one as sophisticated as Ms. M.  *See Record, Vol. V at 1059*.  While two checkboxes were missing on the form, Ms. M. created the missing checkbox next to that option.  *See id*.  To the extent that she was

confused by the language of the mixed "with and without prejudice" option, she had several days to mull the form over before signing it and could have sought help, including from the advocate with whom she had attended the October 31, 2013, IEP team meeting.  She received valuable consideration in exchange for a waiver of claims for the limited period at issue: Kucinkas agreed in writing, among other things, that "[t]he IEP team will meet to consider Dr. Kaufmann's [sic] evaluation and recommendations and will adjust the IEP in light of those recommendations."  *Id.* at 1057.  While, in the end, Ms. M. was dissatisfied with the manner in which Falmouth made that adjustment, she had reason to hope that the parties' agreement could indeed resolve all outstanding issues between them.  In addition, as the hearing officer noted, Ms. M. was anxious to avoid any hearing during the busy and stressful holidays.  Finally, it is telling that Ms. M. testified that she did not inform Kucinkas of any intent to preserve her claims because he would not have liked it.  This buttresses the hearing officer's finding that Ms. M. knew that she was expected to waive her claims as part of the settlement.

59.    Ms. M. falls short of demonstrating that the hearing officer erred in determining that she knowingly and voluntarily waived any IDEA claim for the period from September 1, 2013, through December 17, 2013.

### IV.  Conclusion

For the foregoing reasons, treating the Parent's Brief as a motion for reversal of portions of the hearing decision, I recommend that the motion be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14)*

*days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to __de novo__ review by the district court and to appeal the district court's order.*

Dated this 4th day of March, 2016.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge